Margaret M. GEMMELL

v.

Edwin MEESE, III.

Civ. A. No. 85–5711.

United States District Court,
E.D. Pennsylvania.

June 24, 1986.

Alan Epstein, Philadelphia, Pa., for plaintiff.

John Toothman, Joanne Marchetta, Washington, D.C., for defendant.

## MEMORANDUM

NEWCOMER, District Judge.

Plaintiff, Deputy United States Marshal Margaret Gemmell (DUSM Gemmell), an employee of the United States Marshals Service (USMS), brought this suit against her employer under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–16, alleging sex discrimination and retaliation for her decision to pursue her sex discrimination claims.[1]

After careful consideration of the testimony and the documentary evidence, the Court has determined that judgment should be entered in favor of plaintiff and against defendant on her retaliatory claims only. She failed to sustain her burden of proving individual or systemic sex discrimination.

The following constitute my findings of fact and conclusions of law.

Plaintiff Margaret M. Gemmell is a female Deputy United States Marshal employed by the United States Marshals Service in the Eastern District of Pennsylvania.

Defendant Edwin Meese is the head of the Justice Department, and the USMS is part of the Justice Department. As such, Meese is the sole proper defendant for plaintiff, a federal employee, to sue under Title VII. 42 U.S.C. § 2000e–16(c).

In August of 1979 plaintiff began her employment as a Deputy United States Marshal at the GS–5 level with the USMS in the Southern District of Ohio. After working in the Southern District of Ohio for two years, plaintiff transferred to the USMS in the Eastern District of Pennsylvania in July of 1981 as a result of a hardship (death in the family). Plaintiff has been continuously employed in this district through the present time.

When plaintiff first arrived in the Eastern District of Pennsylvania, the United States Marshal was Edward D. Schaeffer. Plaintiff experienced no professional problems while Marshal Schaeffer was head of the USMS of the Eastern District of Pennsylvania.

In November of 1983, Thomas C. Rapone replaced Marshal Schaeffer as the United States Marshal in the Eastern District of Pennsylvania.

The USMS in the Eastern District of Pennsylvania is divided into three primary squads: the Criminal, Civil and Warrant Squads. From July 1981 through July 31, 1984, plaintiff was assigned to the Criminal Squad where she remained for three years providing courtroom, prisoner and witness protection for the federal district courts. Plaintiff's immediate supervisor while assigned to the Criminal Squad was George W. Campbell.

In July of 1984, plaintiff, in response to an invitation, attended a conference in Washington, D.C. on Women in Law Enforcement. Plaintiff sought—and received—permission to take annual leave for the day. At the conference plaintiff was told by other conferees as well as the EEO Officer in Washington, D.C. (Kipling Williams) that plaintiff was entitled to administrative leave for the conference, in lieu of annual leave. All save one of the conference attendees had received permission for an administrative leave day.

A grant of administrative leave would usually result in time off with pay for job-related activity, and would not affect

---

1. This memorandum was delivered as a bench opinion on June 17, 1986.

the plaintiff's accrued vacation time (annual leave).

Upon returning to the Eastern District of Pennsylvania the next day, plaintiff related the information she had received at the conference regarding administrative leave to her supervisor, George Campbell. Supervisor Campbell refused to grant her administrative leave, believing plaintiff was not entitled to administrative leave because she asked for it *after* the conference, and so he refused to sign the proffered substitute slip.

Plaintiff and Supervisor Campbell exchanged some angry words at that time.

Immediately after leaving Campbell's office plaintiff went to call Kip Williams, the Washington D.C. EEO Officer, to see if he would clear up the problem, and to relate her concern that this refusal was a form of sex discrimination. Finding all of the telephones in the squad room were busy, plaintiff went to the cell block to place the call. Plaintiff did so knowing that United States Marshal Rapone had previously issued an anti-loitering policy prohibiting Deputy United States Marshals from "hanging out" in the cell block area if they did not have official business in the cell block area. The Marshal had issued the policy for security reasons. Plaintiff had never seen anyone reprimanded for violation of the policy although she had observed, and continues to observe, Deputy United States Marshals (all of whom are male) violating the policy within the view of supervisors.

Supervisor Campbell, following plaintiff to the cell block, loudly chastised her for being in the area while not on cell block duty nor assigned to process a prisoner in there. Campbell refused to listen to plaintiff's explanation.

On July 24, 1984 plaintiff again entered the cell block area, this time to get a newspaper from another Deputy United States Marshal. Campbell saw plaintiff in the cell block area, ordered her out of the area in a loud voice, and once again, the two exchanged angry words.

The next day, July 25, 1984, Campbell issued to plaintiff an informal reprimand for her unauthorized presence in the cell block. The informal reprimand was never permanently placed in plaintiff's file, and eventually was removed even from the district file, in October 1984, during conciliation discussions among Marshal Rapone, plaintiff and an EEO Officer. Marshal Rapone never knew precisely why plaintiff had been disciplined, only what Campbell's informal reprimand noted (plaintiff's unauthorized presence in the cell block area twice). Nonetheless, he testified that he removed the reprimand because it had "served its purpose."

In August 1984 plaintiff initiated the EEO grievance procedure, followed later by a formal complaint, an amended formal complaint, and acceptance by the EEOC of issues to investigate. (See Exhibits P-9 through P-13).

Thereafter plaintiff filed a timely complaint in federal court.

Following the initial claim of sex discrimination, the remainder of plaintiff's claims are based, at least in part, on claims of retaliation. Under the facts as presented during trial, construed liberally these claims are such that an administrative investigation which could reasonably be expected to grow out of the initial charges of discrimination would include the entire litany in the complaint. *See Ostapowicz v. Johnson,* 541 F.2d 394 (3d Cir.1976), *cert. denied,* 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977).

Deputy Gemmell subsequently learned that Kipling Williams was mistaken about her entitlement to administrative leave for the Washington, D.C. conference. Nonetheless, plaintiff's filing of the EEO complaint was reasonably based upon her belief that she had been the victim of sex discrimination, and that when she attempted to pursue her right to an EEO investigation of the incident, she became the victim of a series of retaliatory acts.

All of the incidents following plaintiff's contact and formal complaint with the EEO can be explained individually as facially neutral situations, resulting either from the general practice or policy of the United States Marshal Service. However, in com-

bination, and following, for the most part, immediately on the heels of plaintiff's exercise of her right to pursue an EEO grievance, the incidents are too coincidental to be explained away as "standard operating procedure." It was clear to me as I listened to the testimony that, for the most part, the actions taken were done in an arbitrary and subjective fashion, and most logically lead me to the conclusion that plaintiff was retaliated against for pursuing her rights.

Plaintiff alleged a series of retaliatory incidents. I find that with the exception of one alleged incident (regarding use of female clerks for transportation of female prisoners) the remainder of the acts were retaliatory acts in response to plaintiff's initial EEO grievance, her mandated testimony during an internal investigation, and the filing of her federal complaint in October 1985.

Under USMS policy, the Marshals Service is required to send a female Marshal or a qualified matron when female prisoners are being transported. (Exhibit P–7)

Plaintiff was and is assigned even more transportation assignments than her male coworkers because she is on the regular transportation rotation list (for all male prisoners) and she also receives extra transportation assignments when female prisoners are transported.

Plaintiff was subjected to the following retaliatory actions.

Plaintiff was assigned to a special detail on Sunday, July 28, 1984. She had been fully briefed for the sensitive security detail involving protecting a federal witness who was to attend a family member's funeral. On the Friday preceding the special detail, plaintiff called in sick for that day.

Friday afternoon plaintiff's supervisor, George Campbell, called plaintiff and pulled her from the detail. The reason given for pulling plaintiff was a then-unpublished policy of the Marshal stating that any Deputy who called in sick one working day before a special detail assignment would lose the assignment. The policy is facially legitimate, based on a desire by

Marshal Rapone to cut down on a perceived abuse of sick leave, particularly before a weekend special duty assignment.

The special duty assignments often occurred on the weekends, and are considered desirable by the Deputy United States Marshals because the 8–hour day is all overtime. Had plaintiff not been pulled from this assignment she would have earned $129.28 (8 hours × $16.16—the rate of plaintiff's overtime pay at that time).

The sole credible evidence on the existence of the policy *prior* to its use against plaintiff is a handwritten memorandum from Marshal Rapone to his supervisors (Exhibit D–4). There was no evidence that this information was distributed to all Deputy United States Marshals.

The first formal memorandum to all Deputy United States Marshals from Marshal Rapone on this policy was issued July 31, 1984—*after* plaintiff had been removed from the special detail (Exhibit P–6). That memorandum refers generally to other previous memoranda, but Marshal Rapone testified he was not certain others existed, although he remembered issuing the policy orally at a non-mandatory meeting for the office (where no attendance or minutes are recorded).

On July 25, 1984, plaintiff received notice of her temporary rotation effective August 1, 1984, from the Criminal Squad to the Civil Squad in the Eastern District.

Placement in the civil squad results in lower pay because less overtime is generally available. However, at some time plaintiff would have been required to rotate into the civil squad.

On July 25, 1984, three male Deputy United States Marshals were rotated between squads in the Eastern District.

Two of the three Deputy United States Marshals transferred—Cox and Newman— came to plaintiff's aid and supported her claim of unfair treatment by Supervisor Campbell in ordering her out of the cell block and issuing the informal reprimand.

This "coincidence", not explained by defendant's representatives in any satisfac-

tory manner leads me to conclude that plaintiff and her two fellow marshals were transferred in retaliation for pursuing EEO rights and providing corroboration of plaintiff's position, respectively.

The third male Deputy United States Marshal was transferred from the civil squad to the criminal squad because the civil division could not have supported another Deputy United States Marshal so one person had to be transferred out in order to place plaintiff in the civil squad.

However, because plaintiff would have been required to spend 6–18 months in the civil squad at some point, the nine months she spent there does not justify an award of damages for her claimed loss of overtime.

In November of 1984, plaintiff sought training at the Protective Services School (PSS) in Georgia, sponsored by the United States Marshals Service.

Opportunities arose for plaintiff to be sent for the training several times in the following months, but plaintiff was not allowed this training until November, 1985.

The official reason given for the delay is that the availability of slots is limited. However, the more plausible reason is that plaintiff was retaliated against for her initial and continuing complaints of sex discrimination, which by this time were also coupled with retaliation grievances.

Satisfactory completion of PSS is a prerequisite for state department assignments which involve protection of foreign dignitaries.

In November of 1985, during an internal investigation of the then-Chief Deputy United States Marshal O'Connell, plaintiff was required to give testimony to an Inspector Turchek. The internal investigation concerned unauthorized use of department vehicles. Plaintiff was required to testify about any information she had, which included her knowledge of a trip taken by Marshal Rapone, Chief Deputy United States Marshal O'Connell, and Supervisors Campbell and DiNovi to Palumbos, a restaurant in South Philly.

In response to the Inspector's questions about Palumbos, plaintiff stated that it was a "reputed Mafia hangout". Although the information was privileged and should not have been released to anyone in the United States Marshals Service of the Eastern District of Pennsylvania, Inspector Turchek gave Marshal Rapone the plaintiff's affidavit.

Marshal Rapone perceived the statement about Palumbos as defamatory in violation of Offense No. 18 of the U.S. Marshals Manual (Exhibit D–57), and proposed to issue a formal reprimand (Exhibit P–19). Plaintiff took issue with this proposed formal reprimand, and she successfully prevented the official reprimand from being placed in her file.

During questioning by the Court, Marshal Rapone conceded that the substance of the statement reflected an opinion, and as such, could not be considered true or false.

Plaintiff applied in August 1984 for promotion to GS–11 Criminal Investigator. Approximately 19 other applicants applied for the seven available spots.

Plaintiff filled out the requisite form (Exhibit P–13).

The rating sheet for promotion has four major categories of evaluation: Training, Awards, Experience and Performance Appraisal.

The raters are the supervisors for the squads. Here plaintiff was rated by Supervisors George Campbell and Carmen DiNovi.

The successful applicants' scores ranged from 44 to 53. Plaintiff received a score of 27, although she had claimed 53.

While the test strives to be an objective one, it is apparent that in reality, it is administered in a subjective fashion, as demonstrated by Supervisor DiNovi's testimony. He explained disallowing claimed credit by plaintiff based on items such as his own personal lack of knowledge on plaintiff's claims, and his subjective judgment on how much was "enough" in a given category. The guidelines provided to the raters do not explicitly permit, nor ex-

plicitly forbid use of the subjective extrinsic evidence related by Supervisor DiNovi.

Marshal Rapone testified that when DiNovi and Campbell completed their ratings, he certified the top 14 scores (2 for each available slot, as required by Headquarter guidelines) without checking any of the scoring done by the Supervisors. Marshal Rapone, as the Marshal for the Eastern District of Pennsylvania had a duty to exercise some control over the delegated tasks.

The failure to promote plaintiff in the fall of 1984 was another retaliatory act resulting from the plaintiff's complaints of sexual discrimination and retaliation.

In June 1985 plaintiff reapplied for the same GS–11 position when two more positions became available. The same supervisors used the same form and again plaintiff did not receive the promotion because of retaliation.

I must note, however, some disturbing problems presented by both parties.

Thoughout the litany of retaliatory incidents, one name crops up time and again— George Campbell. Campbell was involved in the initial incident regarding administrative leave, the cell block incidents, he wrote the first reprimand, and it was on his unchallenged recommendation that plaintiff, Cox and Newman were transferred. Campbell has since retired from the United States Marshals Service. However, he lives in Bensalem, Pennsylvania, and yet neither party sought to have him testify. This absence leaves a peculiar void in the testimony. Even from the slim evidence presented on Campbell however, I am able to infer that Campbell's actions were retaliatory in nature, and that his continuing influence and control over plaintiff's job opportunities pursued her throughout his tenure.

Moreover, although plaintiff ably discredited the application process using her own application as an example, she had at her disposal the applications and rating scores for at least all of the successful applicants. (Summary of these scores was Exhibit P–17, prepared by defendant).

Nevertheless plaintiff did not make any attempt to show affirmatively that her application, if judged objectively, would have resulted in a qualifying score. For example, she could have used the other applications to compare them with her own application, yet she did so only for one small section of one other application.

As a result, I am left with a subjectively administered test which, in plaintiff's case, as a result of retaliatory acts, prevented her from receiving a promotion. Because plaintiff has not affirmatively shown that she is qualified by comparing successful applications with her own, or by an expert witness qualified to evaluate a Deputy Marshal's performance, I do not feel justified in promoting plaintiff automatically to a GS–11 Criminal Investigator position, since to do so would be speculative. In order to resolve this dilemma and to serve the interests of justice, I will order that plaintiff receive an evaluation by a qualified rater from Headquarters in Washington, D.C.—someone who is completely objective and not personally familiar with plaintiff—to reevaluate her 1985 application with any updated information.

CONCLUSIONS OF LAW

Plaintiff in this action is a female Deputy United States Marshal employed by the United States Marshals Service. She has brought suit under Title VII claiming that the United States Marshals Service discriminated against her on the basis of her sex in assignments, transfers, promotions, training, and discipline, and retaliated against her for pursuing or engaging in protected activities.

The exclusive and preemptive remedy for claims of employment discrimination within the federal government by a federal employee is section 717 of the Civil Rights Act (Title VII), 42 U.S.C. § 2000e–16. *Brown v. General Services Administration*, 425 U.S. 820, 835, 96 S.Ct. 1961, 1969, 48 L.Ed.2d 402 (1976).

Under Title VII, the plaintiff first must establish a prima facie case, whereupon the burden of production shifts to defendant to articulate legitimate, nondiscriminatory reasons for his actions. Upon

such a showing, the burden of production then shifts back to plaintiff to show that defendant's reasons are pretextual and the true motives illegal. *See, e.g., McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973). The burden of persuasion remains on the plaintiff, even though the burden of production may shift to the defendant.

Under Title VII, plaintiff alleges she was a victim of (1) sexual discrimination and (2) retaliation for having filed EEO charges.

■ To prove her claim that any or all of the nine incidents amount to sex discrimination in violation of Title VII, plaintiff has the burden of proving, *inter alia*, that the Marshals Service's articulated reasons are pretextual and that the real reason for each was discrimination because of plaintiff's gender. *See McDonnell Douglas Corp. v. Green*, 411 U.S. at 802–05, 93 S.Ct. at 1824–25.

Defendant articulated legitimate nondiscriminatory reasons for each allegation of sex discrimination, and plaintiff did not show these decisions were a pretext in that they were based on sex discrimination.

Therefore plaintiff has failed to prove disparate treatment based on her gender.

■ To prove her retaliation claim, plaintiff has the burden of proving (1) that she engaged in protected activity, which was known by the alleged retaliator; (2) that an adverse action was taken against her; and (3) that there was a causal connection between the protected activity and the retaliation. *See, e.g., Wrighten v. Metropolitan Hospitals, Inc.*, 726 F.2d 1346, 1354 (9th Cir.1985).

If plaintiff can establish a prima facie case, "the burden of production shifts to the defendant employer to articulate some legitimate, non-retaliatory reason for the adverse action." *Wrighten*, 726 F.2d at 1354.

If defendant meets that burden, plaintiff "must then show that the asserted reason was a pretext for retaliation." *See Cohen v. Fred Meyer*, 686 F.2d 793, 796 (9th Cir. 1982).

■ Throughout this evidentiary process, plaintiff always has the burden of persuasion on the issue of whether defendant intentionally retaliated against her for having engaged in protected activity.

■ With respect to each of the nine alleged discriminatory incidents, to show the requisite causal connection, plaintiff must present sufficient evidence to raise the inference that her protected activity (*i.e.*, the filing of her October 1984 and November 1984 EEO complaints) was the likely reason for these adverse actions. *See Cohen v. Fred Meyer, Inc.*, 686 F.2d at 796.

With the exception of the issue of transportation assignments, plaintiff established that the remaining alleged incidents were retaliatory in nature, caused by plaintiff's EEO complaints, her responses under oath during an internal investigation, and the filing of her federal complaint.

■ Defendant's rebuttal of plaintiff's prima facie case did not ring true in light of the number, timing and context of the incidents.

I therefore find that defendant's explanations were a pretext for the retaliatory actions and that plaintiff has prevailed on her Title VII case of retaliatory discrimination in the enumerated areas.

■ However, for reasons articulated in my findings of fact, I will not order plaintiff to be promoted nor that she receive any claimed loss of overtime for the period she was placed in the civil squad.

Instead, I will order that plaintiff be re-evaluated by a qualified rater from the USMS Headquarters in Washington, D.C. The rater should be completely objective and should not personally know plaintiff. Further I will award plaintiff damages in the amount of $129.28, the amount she would have received had she not been removed from the special duty detail.

■ Plaintiff also claims that "defendant's actions are all part of a pattern and practice of sexual discrimination within the United States Marshals Service, as demon-

strated by its failure to hire, promote and place women in higher-paying positions of importance." ' Complaint ¶ 28. The Supreme Court has made clear that generally, under a "pattern and practice" theory, the plaintiff must prove illegal discrimination against the class he or she claims to represent. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335, 97 S.Ct. 1843, 1854, 52 L.Ed.2d 396 (1977). To do so, plaintiff must prove that alleged differences in treatment between plaintiff, the only woman deputy in the Eastern District of Pennsylvania during the relevant time periods, and other male deputies employed in the district are sexually premised. *Teamsters,* 431 U.S. at 335, 97 S.Ct. at 1854; *Presseisen v. Swarthmore College,* 442 F.Supp. 593, 599 (E.D. Pa.1977), *aff'd,* 582 F.2d 1275 (3d Cir.1978).

In addition, plaintiff alleges a system-wide pattern or practice of resistance to Title VII rights within the United States Marshal Service. To prove this claim she must show by a preponderance of the evidence that (1) a pattern or practice of disparate treatment exists, and (2) the pattern or practice of differential treatment is the defendant's regular and standard operating procedure. *See Presseisen,* 442 F.Supp. at 599.

■ Plaintiff failed to present any evidence at trial in support of these two claims and as such they must fall.