**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JENNIFER WESTENDORF,<br>*Plaintiff-Appellant*,<br><br>v.<br><br>WEST COAST CONTRACTORS OF NEVADA, INC.,<br>*Defendant-Appellee*. | No. 11-16004<br><br>D.C. No.<br>3:09-cv-00272-LRH-RAM<br><br>OPINION |

Appeal from the United States District Court
for the District of Nevada
Larry R. Hicks, District Judge, Presiding

Argued and Submitted
September 11, 2012—Las Vegas, Nevada

Filed April 1, 2013

Before: Morris S. Arnold[*], Johnnie B. Rawlinson,
and Jay S. Bybee, Circuit Judges.

Opinion by Judge Arnold;
Partial Concurrence and Partial Dissent by
Judge Rawlinson

---

[*] The Honorable Morris S. Arnold, Senior Circuit Judge for the Eighth Circuit, sitting by designation.

## SUMMARY[**]

### Employment Discrimination

The panel affirmed in part and reversed in part the district court's summary judgment in favor of the defendant in a Title VII action claiming sexual harassment and retaliatory discharge.

Affirming in part, the panel held that the plaintiff did not make out a prima facie case of sexual harassment because the evidence did not support a finding that the offensive sexual conduct of a co-worker and a supervisor was so severe or pervasive that it altered the conditions of the plaintiff's employment and created a work environment that a reasonable person would consider hostile or abusive.

Reversing in part, the panel held that the district court erred in granting summary judgment on the grounds that the plaintiff failed to make out a prima facie case of retaliation and offered no evidence that the defendant's legitimate reason for terminating her was pretextual. The panel held that the evidence was sufficient to raise a material question of fact as to whether the plaintiff's complaints were a but-for cause of her termination. In addition, the evidence supported a finding that the plaintiff was fired because of her protected activity.

Concurring in part and dissenting in part, Judge Rawlinson agreed that the plaintiff failed to raise a material issue of fact in conjunction with her claim of hostile work

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

environment due to sexual harassment. She did not agree with the majority's conclusion that the plaintiff raised a material issue of fact in conjunction with her claim of retaliation.

## COUNSEL

Mark Mausert, Mark Mausert Law Offices, Reno, Nevada, for Plaintiff-Appellant.

Susan Heaney Hilden, Littler Mendelson PC, Reno, Nevada, for Defendant-Appellee.

## OPINION

ARNOLD, Circuit Judge:

Jennifer Westendorf brought a Title VII action against her former employer, West Coast Contractors, claiming sexual harassment and retaliatory discharge. The district court granted summary judgment to West Coast, and Ms. Westendorf appeals. We affirm the judgment on the harassment claim, and reverse and remand the retaliation claim for further proceedings.

## I.

We view the evidence and inferences from it favorably to Ms. Westendorf. *See Nilsson v. City of Mesa*, 503 F.3d 947, 951 (9th Cir. 2007). In February, 2008, Ms. Westendorf began working for West Coast as a project manager assistant under the supervision of Project Manager Dan Joslyn. She

worked in that position until Mario Ramirez, company president, terminated her on July 29 of the same year.

During the first month of her employment, Mr. Joslyn once referred to Ms. Westendorf's duties as "girly work" and quickly apologized. She didn't complain, but Mr. Ramirez heard about the remark and told her that he would speak to Mr. Joslyn about it; he also said that Mr. Joslyn had had previous problems with employees and that she should tell him if Mr. Joslyn did anything inappropriate. Mr. Joslyn called Ms. Westendorf six weeks later saying that Mr. Ramirez had talked to him about the "girly work" remark, and asked Ms. Westendorf "what the hell" she had said to Mr. Ramirez. When she told Mr. Joslyn that she hadn't reported the incident, he hung up after saying that he'd "been through this shit before" and that "it's just not happening" again.

In May, Ms. Westendorf began working once a week in a trailer at a construction site, where she assisted with subcontractors' meetings and performed other tasks. Patrick Ellis, whom Mr. Joslyn also supervised, had his office at the trailer, and he began making offensive sexual comments to Ms. Westendorf. On one occasion, Mr. Ellis announced that a large-breasted woman, whom he called "Double D," would be at a West Coast barbecue. When the woman arrived at the event, Mr. Joslyn and Mr. Ellis remarked on her breast size and asked Ms. Westendorf whether the size of the woman's breasts intimidated her. In June, Mr. Ellis made some comments to Ms. Westendorf about tampons and asked whether women "got off" when they used a particular kind. Around the same time, Mr. Ellis told her that "women were lucky because [they] got to have multiple orgasms." During each of these incidents, Ms. Westendorf demanded that

Mr. Ellis stop. Mr. Joslyn participated with Mr. Ellis in commenting on the breast size of the woman at the barbecue, and he merely smiled or chuckled when he was present for Mr. Ellis's other offensive remarks. Ms. Westendorf reported each incident to Mr. Ramirez, who would say that he'd talk to Mr. Ellis and that the behavior had to stop. His offensive behavior nevertheless continued. Beginning in May, whenever Ms. Westendorf saw Mr. Ellis or she answered his phone calls to the main office, he would tell her that she had to clean the trailer while wearing a French maid's costume (or maid's uniform) or would make a similar comment to her. In early July, Ms. Westendorf told Mr. Ramirez that Mr. Ellis had said "f___ you" to her several times during a disagreement and when she asked Mr. Joslyn to intervene, he just smiled.

On July 14, Mr. Ramirez arranged to have a court reporter make a record while he questioned Ms. Westendorf, Mr. Joslyn, and Mr. Ellis separately about Ms. Westendorf's complaints. During Ms. Westendorf's interview, she complained about Mr. Ellis's sexual remarks and objected to Mr. Joslyn's failure to do anything to stop them. She also said that she was worried about Mr. Joslyn's reaction to her complaints, and she explained that after she last talked to Mr. Ramirez about him, Mr. Joslyn had phoned her to say that "he didn't need this shit anymore." When he interviewed Mr. Joslyn, Mr. Ramirez said that Ms. Westendorf had complained about his failure to do anything about Mr. Ellis's offensive sexual comments. And he warned Mr. Joslyn that the next time he failed to do anything about an offensive comment to Ms. Westendorf and "she start[ed] bringing up this thing," Mr. Ramirez would have to take "drastic" action, including possibly terminating Mr. Joslyn. Mr. Ramirez told Mr. Joslyn that he was "an incredible, valuable employee."

In response, Mr. Joslyn said that he was "sick of this, totally sick of it." He complained that "one word" could get him in trouble, and that he was now being told that he'd be fired if Mr. Ellis "was to say another derogatory word if I didn't say nothin'." Mr. Ramirez advised him to talk only about work to Ms. Westendorf.

Mr. Ramirez left for vacation about four days later, and Mr. Joslyn began treating Ms. Westendorf differently. He previously had praised her work but began criticizing it and doing what she referred to as "nit picking." He also belittled her in front of subcontractors and started cursing at her for the first time; once when she brought him something that he'd requested, he asked, "What's the matter, don't you have a f___ing voice?"

Mr. Ramirez was back in the office on July 29. That morning, Mr. Joslyn criticized Ms. Westendorf for having told a subcontractor that the West Coast employees would not be able to come to the subcontractor's social event because they would all be at Mr. Joslyn's daughter's wedding. Mr. Joslyn told Ms. Westendorf that he was "offended" at her using his daughter's wedding as an excuse, and he said "f__ you" to her three times while reprimanding her. Ms. Westendorf said, "I'm tired of this crap" and left the room, though she was supposed to attend a meeting that was about to start. Mr. Ramirez's assistant told him that Ms. Westendorf was upset and had said that she didn't want to work with Mr. Joslyn or Mr. Ellis; Mr. Ramirez called Mr. Joslyn and heard his rendition of the morning's events.

Ms. Westendorf then arrived at Mr. Ramirez's office, telling him that "things happened again" while he was gone and bringing a list of the incidents with her. Before she could

explain fully, Mr. Ramirez questioned her about the subcontractor's party invitation. Ms. Westendorf then began to tell Mr. Ramirez about how Mr. Joslyn had been treating her. For example, she said that he had a binder in front of him and, when she handed him a piece of paper, he told her to put it in the binder herself, a task he had not asked her to do before. He then smirked at Mr. Ellis, while reprimanding Ms. Westendorf for not performing the task. Mr. Ramirez said that she should do what Mr. Joslyn told her to do, and Ms. Westendorf complained that Mr. Ramirez was not going to do anything about the problem. Finally, Mr. Ramirez said "that he was tired of listening to all this and that obviously [she] had a problem getting along with [Mr. Joslyn] and that it would be best if [she] got [her] personal items and left." Mr. Ramirez and two other employees escorted her from the building. At her deposition, Ms. Westendorf testified that she was fired. Mr. Ramirez admitted that she was escorted from the building, but said that she had quit.

## II.

To establish a hostile work environment claim based on sexual harassment, Ms. Westendorf had to show that she "was subjected to verbal or physical conduct of a sexual nature, ... that was unwelcome; and ... that was sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *See E.E.O.C. v. Prospect Airport Servs., Inc.*, 621 F.3d 991, 997 (9th Cir. 2010). She had to present evidence to support a finding that a "reasonable person" would find her work environment to be "hostile or abusive" and that she in fact did so. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998).

In assessing whether the evidence could support a finding that Ms. Westendorf was subjected to a hostile or abusive work environment, we consider the conduct of both Mr. Ellis, her co-worker, and Mr. Joslyn, her immediate supervisor. An employer is liable for a hostile environment created by a plaintiff's co-worker if it knew or should have known about the misconduct and failed to take "prompt and effective remedial action." *Prospect Airport Servs.*, 621 F.3d at 1001. We consider Mr. Ellis's offensive remarks in this context because Ms. Westendorf testified that they began in May and that she told Mr. Ramirez within three days of each incident, but the record would support a finding that he took no action until July 14. Because Mr. Joslyn supervised Ms. Westendorf and West Coast did not establish an affirmative defense as a matter of law, we also consider his conduct when determining whether she made out a claim against the company. *See Montero v. AGCO Corp.*, 192 F.3d 856, 861 (9th Cir. 1999).

Having considered the evidence as a whole, we conclude that Ms. Westendorf did not make out a *prima facie* case of sexual harassment because the evidence will not support a finding that the offensive sexual conduct was so severe or pervasive that it altered the conditions of her employment and created a work environment that a reasonable person would consider hostile or abusive. "We weigh both severity and pervasiveness to evaluate whether a reasonable victim would think that sexual harassment had become a permanent feature of the employment relationship." *Prospect Airport Servs.*, 621 F.3d at 999-1000. To determine whether a hostile work environment claim is actionable, we consider all of the circumstances, which " 'may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d]' " with the employee's

work performance.  *Id.* at 998-99 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

Although we certainly do not condone Mr. Ellis's crude and offensive remarks, we note that Ms. Westendorf went to his workplace only once a week for three months and often did not stay an entire day.  Other than his references to the French maid's costume, Mr. Ellis reportedly made offensive sexual remarks to Ms. Westendorf on only about four occasions.  Mr. Joslyn joined Mr. Ellis in the "Double D" comments but otherwise made no sexual remarks to Ms. Westendorf, and he quickly apologized for his "girly work" remark, which she did not deem serious enough to complain about.  The harassment was not physical and Ms. Westendorf did not say that her work suffered because of it.  Because we conclude that the evidence, viewed favorably to her, did not show sexual harassment that was sufficiently severe or pervasive to alter the terms of Ms. Westendorf's employment and subject her to an abusive environment, we affirm the judgment for West Coast on her sexual harassment claim.

### III.

Ms. Westendorf also claimed that she was fired in retaliation for complaining about sexual harassment.  To make out a *prima facie* retaliation case, she had to show that she engaged in protected activity, that she suffered a materially adverse action, and that there was a causal relationship between the two.  *See Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006); *Bergene v. Salt River Project Agric. Improvement & Power Dist.*, 272 F.3d 1136, 1140–41 (9th Cir. 2001).  An employee engages in protected activity when she opposes an employment practice that either violates Title VII or that the

employee reasonably believes violates that law. *See Freitag v. Ayers*, 468 F.3d 528, 541 (9th Cir. 2006), *cert. denied*, 549 U.S. 1323 (2007); 42 U.S.C. § 2000e-3(a). Even though we have held that the evidence did not support Ms. Westendorf's sexual harassment claim, we think that it could support a reasonable belief that she was subjected to actionable sexual harassment, and that she had such a belief. In such circumstances, her complaints about that conduct would be protected activity.

The district court determined, however, based on Ms. Westendorf's deposition testimony, that she was claiming that Mr. Ramirez fired her only in retaliation for the complaints she had on July 29. The court also concluded that she then complained about Mr. Joslyn's work-related comments during Mr. Ramirez's absence, conduct that did not violate Title VII. Therefore, the court reasoned, her complaints at the relevant time were not protected conduct, and she did not make out a retaliation claim.

But we believe that the court did not comply with its obligation at summary judgment to view the evidence and all inferences from the evidence favorably to Ms. Westendorf, when it so strictly circumscribed her retaliation claim. We think that "reasonable minds could differ as to the import" of her deposition testimony, *see Anderson v. Liberty Lobby*, 477 U.S. 242, 250–51 (1986), and that the evidence and inferences from it, when viewed favorably to her, are sufficient to support a retaliation claim.

To make out such a claim, Ms. Westendorf had to show that her protected conduct was a but-for cause — but not necessarily the only cause — of her termination. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064–65 (9th Cir.

2002).    The district court referred to Ms. Westendorf's deposition to support its conclusion that she alleged that she was fired solely for her July 29 complaints.  At one point, Ms. Westendorf answered "yes," when West Coast's counsel asked whether she was claiming that she was terminated "because [she] complained on July 29th."  We think that this affirmative response is both general and ambiguous and in any case does not compel a conclusion that she claimed that Mr. Ramirez fired her solely because of her complaints about what happened during his absence.  As one example, we think that Ms. Westendorf's answer may have meant merely that her complaining on that date had triggered Mr. Ramirez's decision to fire her, not that he had no thought of all that had gone before.  Mr. Ramirez himself testified that she came to his office saying that "things happened again" while he was gone, an obvious reference to the behavior she had complained about on July 14.    And we believe that a reasonable inference could be drawn that her July 29 complaints about Mr. Joslyn would have brought to Mr. Ramirez's mind her complaint about Mr. Joslyn only fifteen days earlier at interviews that Mr. Ramirez himself had arranged and conducted.   He had thought her complaint serious enough at the time to bring it to Mr. Joslyn's attention and even to warn him of possible termination.  And we note Mr. Ramirez's stated reason for firing her:  According to Ms. Westendorf, he said "that he was tired of listening to all this and that obviously [she] had a problem getting along with [Mr. Joslyn] and that it would be best if [she] got [her] personal items and left."  The problem of Ms. Westendorf and Mr. Joslyn not "getting along" had been well-illustrated during Mr. Ramirez's interviews with them on July 14.

We conclude that the record evidence was sufficient to raise a material question of fact as to whether Ms.

Westendorf's July 14 complaints — which we have already said could be "protected activity" — were a but-for cause of her termination. We therefore believe that the district court erred in granting the summary judgment motion on the ground that she failed to make out a *prima facie* case of retaliation.

The district court also held, in the alternative, that West Coast was entitled to summary judgment because Ms. Westendorf offered no evidence that its legitimate reason for terminating her was pretextual. *See Dawson v. Entek Int'l*, 630 F.3d 928, 936 (9th Cir. 2011). We see no merit to this conclusion. First, West Coast did not offer any evidence of its reason for firing Ms. Westendorf because it denied doing so. Mr. Ramirez wrote to her specifically denying that he had fired her, and he testified to that effect at his deposition. Though he also testified that he would not rehire Ms. Westendorf because, in response to his hypothetical question on July 29, she said that she would not follow a direction from him that she did not agree with, he did not say that he terminated her for that reason. We believe, moreover, that even if West Coast had proffered this as a reason for discharging Ms. Westendorf, her *prima facie* case and related inferences might well support a finding of pretext, especially since she had no record of insubordination until she complained about sexual harassment. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 n.10 (1981).

We conclude that the evidence supports a finding that Mr. Ramirez fired Ms. Westendorf because of her protected activity and would not otherwise have done so. We therefore

reverse the entry of judgment for West Coast on the retaliation claim and remand to the district court for further proceedings not inconsistent with this opinion.

**AFFIRMED in part, REVERSED in part, and REMANDED.** The parties shall bear their own costs on appeal.

RAWLINSON, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority's conclusion that Plaintiff Jennifer Westendorf failed to raise a material issue of fact in conjunction with her claim of hostile work environment due to sexual harassment. I do not agree with the majority's conclusion that Westendorf raised a material issue of fact in conjunction with her claim of retaliation.

## Background

Westendorf contends that she was terminated by Mario Ramirez, the president of her employer, West Coast Contractors of Nevada, Inc. According to Westendorf, Ramirez terminated her in retaliation for her continued complaints of sexual harassment.

This case involved two discrete sessions involving Ramirez's attempts to resolve Westendorf's complaints. The first occurred on July 14, 2008. Ramirez hired a court reporter to memorialize the meeting, then separately questioned Westendorf, her supervisor and her co-worker, who were allegedly creating a hostile work environment by

engaging in sexually harassing conduct.  After hearing from the involved parties, and even though the complained of conduct did not rise to the level of sexual harassment, Ramirez took corrective action.  He warned both Westendorf's supervisor and co-worker that they faced discipline, up to and including termination.  Ramirez also withheld a bonus that he had previously planned to give Westendorf's co-worker.

The second session occurred after Ramirez returned from vacation approximately two weeks later.  This session was precipitated by a conflict between Westendorf and her supervisor regarding Westendorf's unilateral decision to inform a subcontractor that none of the company's employees would attend the subcontractor's social event because they would all be attending the wedding of her supervisor's daughter.  Ramirez explained in his deposition that Westendorf acted inappropriately by depriving company employees of the opportunity to decide individually whether to attend the subcontractor event to maintain good business relations.

When her supervisor reprimanded her verbally for her inappropriate action, Westendorf responded, "I'm tired of this crap" and left, even though she was supposed to attend a meeting that was about to commence.  Westendorf then appeared at Ramirez's office to inform him about incidents that had occurred while Ramirez was on vacation.  Ramirez inquired about the most immediate conflict regarding the subcontractor event.  Rather than responding directly, Westendorf began to explain by way of example that her supervisor had a binder in front of him and, when she gave him a piece of paper, he told her to put the paper in the binder rather than putting the paper inside the binder himself.

Ramirez informed Westendorf that she should comply if her supervisor instructed her to perform a job-related task. Ultimately, Westendorf left the premises. Ramirez took the position that Westendorf resigned, while Westendorf maintained that she was terminated.

## Legal Standards

In reviewing the summary judgment ruling, we view the evidence in the light most favorable to Westendorf, the non-moving party. *See Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011). We must determine whether the evidence so viewed raised a material issue of fact, thereby precluding summary judgment. *See id*.

In determining whether a material issue of fact has been raised on a retaliation claim, we apply the familiar *McDonell Douglas* standard.[1] *See Cohen v. Fred Meyer, Inc*., 686 F.2d 793, 796 (9th Cir. 1982). Under that standard, the Plaintiff must first establish a *prima facie* case of retaliation. *See id*.

## Discussion

I do not quarrel with the majority's conclusion that Westendorf established a *prima facie* case of retaliation, because viewed in the light most favorable to Westendorf, she engaged in protected conduct when she met with Ramirez on July 29 to report what she perceived as retaliatory conduct. *See Villiarimo v. Aloha Island Air*, 281 F.3d 1054, 1064 (9th Cir. 2002) (recognizing an internal complaint of harassment as protected activity). According to Westendorf, she was terminated immediately following her report. *See id*. at 1065

---

[1] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

(noting that adverse action in close proximity to the protected conduct may establish a *prima facie* case of retaliation). However, I do quarrel with the majority's attempt to include the pre-July 14 events in the retaliation analysis.

It is undisputed that following the July 14 session, Ramirez counseled Westendorf's co-worker and her supervisor. In addition, Ramirez withheld a bonus that was intended for Westendorf's co-worker. Because the pre-July 14 complaints were addressed by Ramirez, they are no longer part of the *McDonnell Douglas* paradigm. *See Dawson v. Enteck Intern.*, 630 F.3d 928, 940 (9th Cir. 2011) (explaining that the employer has no liability for asserted harassment that has been remediated). Rather than dwelling on remediated complaints, we proceed to the balance of the analysis for the retaliation complaint: Once the plaintiff establishes a *prima facie* case of retaliation, the burden of production shifts to the defendant to articulate a "legitimate, non-retaliatory reason for the adverse action. . . . [T]he plaintiff must then show that the asserted reason was a pretext for retaliation. . . ." *Cohen*, 686 F.2d at 796 (citations omitted). In assessing whether the employer's reason for the action is pretextual, "it is not important whether [the proffered justification is] *objectively* false," i.e., whether Westendorf was actually insubordinate. *Villiarimo*, 281 F.3d at 1063 (internal quotation marks omitted) (emphasis in the original). "Rather, courts only require that an employer honestly believed its reason for its actions, even if its reason is foolish, or trivial or even baseless. . . ." *Id.* (citation and internal quotation marks omitted). If the employee presents no evidence that the employer did not believe its proffered justification, summary judgment in favor of the employer is warranted. *See id.*

I completely agree with the district court's alternative holding that Westendorf offered no evidence of pretext.  The majority attempts to counter the district court's holding by remarking that Ramirez offered no evidence of his reason for terminating Westendorf because Ramirez denied terminating her.  However, the majority cannot have it both ways.  If the evidence is to be interpreted in favor of Westendorf's assertion that she was terminated, that inference of termination remains throughout the analysis.  In any event, Ramirez testified that even though he thought Westendorf had resigned, he declined her request for reinstatement due to her insistence that she did not have to follow the directions of her supervisors.  Ramirez specifically testified that he "would not have somebody who is going to work for me" where that person is not willing to follow instructions from her supervisors.  He expressly stated that was the reason he would not let Westendorf return to his company.  Whether characterized as a termination or a failure to reinstate employment after a resignation, the record is crystal clear and unrefuted that Ramirez proffered Westendorf's stated defiance of supervisory authority as the basis for the adverse employment action.

The majority further attempts to bolster Westendorf's case by suggesting that "her *prima facie* case and related inferences *might well support* a finding of pretext." *Majority Opinion*, p. 12. (emphasis added).  The majority cites *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 n.10 (1981) as support.  However, the referenced opinion note does not state that a *prima facie* case and related inferences "might well support a finding of pretext."  Rather, the note states that the evidence from the *prima facie* case "and inferences properly drawn therefrom may be considered by the trier of fact" in deciding whether the employer's proffered

explanation is a pretext. The note goes on to explain: "Indeed, there may be some cases where the plaintiff's initial evidence, *combined with effective cross-examination of the defendant*, will suffice to discredit the defendant's explanation." *Id.* (emphasis added).

It is understandable why the majority failed to include the entirety of the referenced note because the facts of this case diverge considerably from the scenario described in the note. The cross-examination of Ramirez simply reinforced his testimony that he declined to reinstate Westendorf because she persisted in her refusal to follow directions from her supervisors. The proffered explanation was never challenged in any way as pretextual. This lack of evidence of pretext supports entry of summary judgment in favor of the employer. *See Villiarimo*, 281 F.3d at 1063 (affirming the district court's entry of summary judgment in favor of the employer because the employee "presented no evidence that [the employer] did not honestly believe its proffered reasons").

## Conclusion

Even after viewing the evidence in the light most favorable to Westendorf, she failed to raise a material issue of fact that the reasons Ramirez proffered for the adverse employment action were pretextual. For that reason, I would affirm in its entirety the district court's judgment in favor of the employer. I respectfully dissent from that portion of the majority opinion reversing the judgment on Westendorf's retaliation claim.